# Illinois Official Reports

## Appellate Court

***People v. Minniefield*, 2014 IL App (1st) 130535**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY MINNIEFIELD, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0535 |
| Filed<br>Rehearing denied | December 31, 2014<br>February 5, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court upheld the trial court's second-stage dismissal of defendant's *pro se* postconviction petition, as supplemented by defense counsel, filed following a jury's finding that he was guilty of first-degree murder and the sentence of 25 years plus a 25-year enhancement for personally discharging a firearm, since defendant's claims that he made a substantial showing that he acted in self-defense and was innocent and that his counsel was ineffective for failing to request an involuntary manslaughter instruction and for failing to investigate a call from occurrence witnesses were not persuasive. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-1284; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Yasaman Hannah Navai, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michele Grimaldi Stein, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Gregory Minniefield was found guilty after a jury trial of first-degree murder and sentenced to 25 years for murder, plus a 25-year enhancement for personally discharging a firearm, for a total of 50 years with the Illinois Department of Corrections.

¶ 2    At his jury trial, defendant testified: that he walked with a gun at his side toward the victim's parked vehicle, that the victim said "Oh, s***!" and reached toward something on the floor, that defendant reached his gun inside the victim's vehicle and fired two shots in self-defense toward "whatever" the victim was reaching for, that the victim's vehicle moved forward, and that the driver's window frame hit defendant's gun, causing it to discharge multiple times accidentally. Thus, there was no dispute at trial that defendant was the shooter or that the shots from defendant's gun killed the victim. The only issues at trial concerned self-defense and accident and, at defense counsel's request, the jury received second-degree murder instructions and a self-defense instruction. However, the jury rejected these options and convicted defendant of first-degree murder.

¶ 3    On direct appeal, defendant claimed that his counsel was ineffective for failing to request an involuntary manslaughter instruction because his testimony demonstrated that he acted recklessly when he shot the victim. The appellate court held that, since the record did not disclose whether counsel and defendant discussed this option, "the basis of defendant's ineffective assistance claim wholly relies on matters not of record," and "the claim must be raised in a collateral proceeding," such as a postconviction proceeding. *People v. Minniefield*, No. 1-05-2792, slip op. at 6 (2007) (unpublished order under Supreme Court Rule 23).

¶ 4    Defendant then filed a *pro se* postconviction petition in December 2007, alleging ineffective assistance of trial counsel based on counsel's alleged failure both to request an involuntary manslaughter jury instruction and to investigate witnesses. The trial court summarily dismissed the petition on February 6, 2008, finding his claims frivolous and patently without merit. On May 28, 2010, this court reversed the trial court's summary dismissal holding that, on the record before it, defendant's "allegation that counsel failed to investigate or present witnesses has an arguable basis in law and fact." *People v. Minniefield*,

No. 1-08-0649, slip op. at 4 (2010) (unpublished order under Supreme Court Rule 23) (remanding the case for second-stage proceedings). After remand and appointment of counsel, counsel filed a supplemental petition, which the trial court dismissed on January 15, 2013.

¶ 5 It is this January 15, 2013, second-stage dismissal which is the subject of the current appeal. On this appeal, defendant argues: (1) that he has made a substantial showing that he acted in self-defense and thus is actually innocent; and (2) that his counsel was ineffective (a) for failing to ask for an involuntary manslaughter jury instruction and (b) for failing to investigate or call occurrence witnesses. At the second-stage proceeding which we are reviewing, the State conceded that the two affidavits which defendant submitted in support of his actual innocence claim are newly discovered. Defendant requests this court to remand for a third-stage evidentiary hearing.

¶ 6 For the following reasons, we affirm.

¶ 7                                     BACKGROUND
¶ 8                              I. The Evidence at Trial
¶ 9                                   A. The Events

¶ 10 On direct appeal, we summarized the evidence at trial as follows:

"The trial evidence demonstrated that, on December 17, 2002, defendant fatally shot the victim, Theopolis[1] Ransberry. Immediately prior, defendant was driving a car with two passengers, his girlfriend and cousin. The victim was simultaneously driving his car with three passengers. Although defendant admitted that he shot the victim, the trial testimony conflicted regarding the exact chain of events leading to the victim's death. The State's witnesses, including the victim's passengers and defendant's cousin, testified that defendant instigated the exchange with the victim by shooting at the victim's car. Then, after the victim subsequently pulled his car over, defendant approached on foot and shot the victim several more times absent provocation. Contrarily defendant testified that he did not shoot the victim until, after approaching the victim's car to merely talk, he thought the victim was reaching for a gun, and thus responsively shot the victim's hand twice. Then because the victim began to drive away while defendant's hand remained partially inside the car, defendant's hand hit the window causing the handgun to fire several more times." *Minniefield*, No. 1-05-2792, slip op. at 2.

¶ 11                           B. Defendant's Pretrial Confession
¶ 12 We further described defendant's pretrial confession as follows:

"At trial, Assistant State's Attorney (ASA) John Brady testified that defendant agreed to have his statement videotaped, and it was published to the jury over defense counsel's objections. In the statement, defendant admitted that he chased the victim's car on the day in question because they were engaged in an ongoing feud over money. Defendant further admitted that, while chasing the victim's car, he fired two gunshots into the air. Defendant additionally admitted that he approached the victim's car,

---
[1]The victim's first name is spelled several different ways in the appellate record and we are not certain which spelling is correct.

grabbed the chain around his neck and demanded money that the victim owed him. The victim moved and defendant fired his handgun toward the victim's leg. Then, while defendant's handgun remained inside the car, the car moved approximately two feet causing defendant to shoot the victim four additional times. Defendant admitted that no one was armed in the victim's car. Defendant knew that bullets hit both the victim and Roshawn Adams, one of the passengers; however, he fled the scene and disposed of his handgun. Defendant stated that he merely intended to scare the victim, not to hurt him." *Minniefield*, No. 1-05-2792, slip op. at 2.

¶ 13                              C. Defendant's Testimony at Trial

¶ 14          We described defendant's trial testimony as follows:

"Defendant testified that, in April 2002, he and the victim had a conversation during which the victim denied involvement in an incident with defendant's girlfriend. He further testified that, early in the afternoon on the day in question, defendant was driving with his two-year[-]old son when the victim opened fire at defendant's car. Defendant found a police officer in the area and reported the incident; however, the officer was forced to leave on an emergency call. At some point during the day, defendant purchased a loaded handgun for protection.

Later in the evening, defendant was driving with his girlfriend, Nicole Saunders, and his cousin, Erica Simmons, when he recognized the victim's car pass him and stop. Defendant approached the victim's car on foot, armed with his handgun, to talk to him about a misunderstanding involving Sanders. Defendant, however, saw the victim reach for what he thought was a handgun, and as a result, shot inside the car in an attempt to shoot whatever the victim was trying to retrieve. After firing two shots, the victim began to drive away. Defendant's hand, however, was still inside the car. As a result, the window frame hit defendant's hand causing the gun to fire several more times. Defendant testified that he did not intend to fire the handgun and he did not think that he shot anyone.

Defendant further maintained that he was mistreated while in police custody, and despite expressly invoking his rights to an attorney and to remain silent, his *Miranda* rights were violated.[2] Defendant claimed that he told Detective Ron Lewis and Timothy Nolan that the victim threatened him and that he shot the victim because he thought the victim was reaching for a weapon. Defendant, however, admitted that he did not make the same claims in his videotaped statement.

On cross-examination, defendant stated that he thought the victim initially shot at his car because the victim mistakenly thought that defendant was involved in a prior attack on the victim, which was actually instigated by defendant's girlfriend. He admitted, however, that during the incident the victim did not make any threats." *Minniefield*, No. 1-05-2792, slip op. at 2-4.

---

[2]Prior to trial, the trial court denied defendant's motion to suppress the statements he made while in police custody.

¶ 15                    D. The State's Rebuttal Evidence

¶ 16    We described the State's rebuttal case as follows:

> "In rebuttal, Detective Lewis testified that defendant did not report that the victim shot at him while he was driving his son or that he thought the victim was reaching for a handgun. On cross-examination, however, Lewis admitted that defendant told him that the victim had threatened defendant. Also, in rebuttal, Detective Nolan reiterated that defendant did not report that the victim shot at him. On cross-examination, however, Nolan admitted that defendant requested that he only shot inside the victim's car because the victim was reaching for something." *Minniefield*, No. 1-05-2792, slip op. at 4.

¶ 17                          E. Jury Instructions

¶ 18    At the jury instruction conference, defense counsel requested instructions on both second-degree murder and self-defense, which the trial court gave over the State's objection.

¶ 19    The jurors were instructed that, in order to sustain the charge of first-degree murder, the State had the burden of proving that "the defendant was not justified in using the force he used."

¶ 20    As to when force is justified, the jurors were instructed:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

¶ 21    With respect to second-degree murder, the jury was instructed:

> "You may not consider whether the defendant is guilty of the lesser offense of second degree murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the previously stated propositions.
>
> The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder. By this I mean that you must be persuaded, considering all the evidence in this case, that it is more probably true than not true that the following mitigating factor is present: that the defendant, at the time he performed the acts which caused the death of Theopulous Ransberry, believed the circumstances to be such that they justified the deadly force he used, but, his belief that such circumstances existed was unreasonable."

Thus, the jurors were also instructed to consider, if they first found that the State had proved that "the defendant was not justified in using the force he used" and he was guilty of first-degree murder, whether he had an unreasonable belief in the need for the use of deadly force.

¶ 22    After receiving its instructions, the jury convicted defendant of first-degree murder, and defendant was sentenced to 50 years of imprisonment, and his conviction was affirmed on direct appeal.

¶ 23                                    II. Postconviction Proceedings

¶ 24        Defendant filed a *pro se* postconviction petition on December 27, 2007, alleging ineffective assistance of counsel, which the trial court summarily dismissed as frivolous on February 6, 2008.

¶ 25                                 A. Reversal of First-Stage Dismissal

¶ 26        On appeal, we reversed the summary first-stage dismissal. *Minniefield*, No. 1-08-0649, slip op. at 7. Since "[t]he law-of-the-case doctrine prohibits the reconsideration of issues that have been decided by a reviewing court in a prior appeal" (*In re Christopher K.*, 217 Ill. 2d 348, 363 (2005)), we provide here our prior holding and reasoning:

> "We find defendant's claim should have survived first-stage review because his allegation that counsel failed to investigate or present witnesses has an arguable basis in law and fact. [Citation.] As a threshhold matter, we note that defendant appended his own affidavit as well as one from Ratliff. A claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. [Citation.] Therefore, we do not consider the proposed testimony from Knighton in our determination. [Citation.]
>
> We find that defendant's allegation has an arguable basis in fact. At trial, defendant's testimony presented an 'imperfect self-defense' theory: that he fired his gun at the victim after believing he saw the victim reach for a gun. However, the State's testimony established that police did not recover a gun from the victim's automobile. In his petition, defendant alleged that Ratliff would testify that an unknown man removed a silver gun from the automobile before police arrived on the scene. Defendant appended an affidavit in which Ratliff averred as such, and also that counsel never investigated his statement. In his own affidavit, defendant averred that he told counsel about Ratliff and Knighton. Taken as true at this stage [citation], Ratliff's affidavit lends support to defendant's theory of defense and defendant's affidavit establishes that counsel knew of the witnesses. Therefore we cannot find the facts in defendant's allegations 'fantastic or delusional.' [Citation.]
>
> We also cannot find defendant's allegation presented an indisputably meritless legal theory. A constitutional claim that a defendant did not receive effective assistance of counsel must demonstrate that it is arguable that counsel's performance fell below an objective standard of reasonableness and the defendant was arguably prejudiced as a result. [Citation.] Defendant testified at trial that he believed the victim was reaching for a gun and that based on this belief, fired one or two shots toward the victim. Testimony presented by the State established that the police did not recover a gun from the victim's automobile. The allegations related to Ratliff's testimony corroborate defendant's belief that the victim was reaching for a gun. We find this failure to investigate could arguably demonstrate that counsel's performance was objectively unreasonable. [Citation.] Finally, the affidavits support the allegation that counsel failed to investigate Ratliff's testimony. Although the evidence against defendant was strong, it is at least 'arguable' that evidence of a gun in the victim's car could have changed the outcome." *Minniefield*, No. 1-08-0649, slip op. at 5-7.

Thus, it is the law of the case that "it is at least 'arguable,' " based on the record then before the appellate court, "that evidence of a gun in the victim's car could have changed the outcome." *Minniefield*, No. 1-08-0649, slip op. at 7.

¶ 27    The prior appellate panel did not reach defendant's second allegation concerning ineffectiveness based on a failure to ask for further jury instructions, since it was already reversing on the first issue. *Minniefield*, No. 1-08-0649, slip op. at 7. The court stated that, because the law "does not permit partial summary dismissals, we need not consider whether defendant's second allegation has an arguable basis in law and fact." *Minniefield*, No. 1-08-0649, slip op. at 7.

¶ 28                              B. Trial Court's Order on Remand
¶ 29                              1. Petitions Under Consideration
¶ 30    On remand, counsel was appointed and filed a supplemental petition, supplementing the claims and allegations that defendant already made in his *pro se* petition. Since counsel's Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984)) certificate states that he "amended, supplemented and adopted the arguments of the *pro se* petition," we describe first the *pro se* petition and the affidavits attached to it, and then counsel's supplemental petition and the affidavits attached to it.

¶ 31                              a. Defendant's *Pro Se* Petition
¶ 32    In his *pro se* petition, filed December 31, 2007, defendant alleged that "prior to trial, I informed my trial attorney that Michelle Knighton and Thomas Ratliff were present[ ] after the shooting and saw an unknown male take a silver gun off the front passenger floor and [leave] with it before the police came" and that defense counsel was ineffective for failing to call these two witnesses to testify. Defendant also alleged that "defense counsel was ineffective for not requesting an involuntary manslaughter instruction where there was sufficient evidence to support it."

¶ 33    In support, defendant swore in his own "Affidavit," that "I informed my lawyer *** about the two witnesses on behalf of my defense and I also asked my attorney to put in a[n] involuntary manslaughter instruction to the jury."

¶ 34    The two affidavits submitted with defendant's petition are signed but the signatures are not dated or notarized. They are certified by the affiant under section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2006)).

¶ 35    In support, defendant also submitted the "Affidavit" of Thomas Ratliff, which stated:

> "On December 17, 2002[,] I was coming out [of] a friend['s] house after we heard gun fire and saw [the victim] in a tan or brown car crashed into another car. I walked up 44th Place and saw three guys and two females in [the victim's] car. One female was crying. She was shot and one of the guys by the car took a silver looking gun off the front passenger floor and left with it before the police came. I informed [defendant's] attorney and he took my information down and he was going to contact me before trial but never did so?"

¶ 36    Defendant also attached a sheet of what appear to be a police officer's investigation notes, and his *pro se* petition also referred to a "police report." The report did not mention Ratliff but stated the following concerning Michelle Knighton: "Heard approximately five shots. Saw a

female black with a beig[e] jacket, blond and black braids standing near the victim's auto. Saw three unknown males leaning into victim's car." Defendant did not include an affidavit from Knighton.

¶ 37                                    b. Counsel's Supplemental Petition

¶ 38        Counsel's supplemental petition argued (1) that trial counsel was ineffective for not calling Ratliff, who indicated prior to trial that the victim was armed; and (2) that the newly available testimony of Noah Redic and Antoine Nash that the victim was armed with a gun would have changed the outcome at trial, resulting in an acquittal or reducing the conviction to second-degree murder. The supplemental petition states that Ratliff is not a newly discovered witness and that his affidavit is submitted to support defendant's ineffective assistance claim.

¶ 39        Attached to counsel's supplemental petition were (1) two additional affidavits from defendant, dated August 9, 2011, and August 25, 2011; (2) the prior "Affidavit" from Thomas Ratliff; (3) an affidavit from Noah Redic, dated May 14, 2010; and (4) an affidavit from Antoine Nash, dated May 14, 2010.

¶ 40        In his August 9, 2011, affidavit, which is not notarized but is sworn to under penalty of perjury, defendant stated: "I asked my attorney why Mr. Ratliff wasn't called to testify and my attorney said the investigator never got the chance to interview him before my trial." His August 25, 2011, affidavit realleges this information and is dated and notarized. Thomas Ratliff's affidavit contains substantially the same information as the affidavit attached to defendant's *pro se* petition and is also sworn to under penalty of perjury but the Ratliff affidavit attached to the supplemental petition is dated September 6, 2007.

¶ 41        Noah Redic's affidavit is dated and notarized, and it states:

"On December 17, 2002, I was waiting outside between 44th and 45th [and] Lavergne [Avenue] on my brother to pick me up so we could go out to eat. While I was waiting a tan car pulled up with people in it. Once I realized it was [the victim] I walked up to the car to see what he was up to. He had three females in the car and we all started talking when twan [*sic*] walked up and all of a sudden [defendant] pulled up behind [the victim's] car and got out. [The victim] looked back and said oh s*** as [defendant] approached the driver[']s side door. I thought nothing of it until I saw [the victim] grab[ ] a silver gun from between the armrest and [defendant] upped a black gun[,] stepped back and let off a shot. I pushed twan out my way so I wouldn't get hit and heard about four or five more shots and cars driving away. At that time, my brother rode up and I jumped in his car and we left the neighborhood. I'm coming forward now because [defendant's] mother reached out to my mother and told her that I knew what happened that night and I should have come forward with this information, so I wrote up this affidavit and gave it to [defendant's] mother ***."

Thus, in Redic's affidavit, he admits that defendant's mother knew that he knew what happened that night and believed that he should have come forward earlier. He also admits that defendant's mother knew how to reach him, which was by contacting Redic's own mother. Redic offers no reason in his affidavit either why he did not come forward earlier or why defendant did not try to contact him earlier.

¶ 42        Antoine Nash's affidavit is also dated and notarized, and it states:

- 8 -

"On December 17, 2002, myself and my girlfriend was standing in front of my house when it started getting dark outside, so I decided to walk her halfway home. I walked her to 44th and Lavergne [Avenue], so I started walking. I saw Noel talking to [the victim] and a car full of females. I walked up to the passenger side of the car where Noel was standing, when all of a sudden a white car driven by [defendant] pulled up behind [the victim's] car. [Defendant] jumped out and approached the driver[']s side of [the victim's] car. I heard the victim say 'Oh s***,' and [defendant] said something. That's when [the victim] grabbed a silver gun from between the armrest and [defendant] stepped back and let off a shot. Noel pushed me between a parked car and I heard a lot more shots. Once the shooting stopped I ran back home because I knew my house arrest box was going off. I didn't come forward that night because I didn't want to get locked up for not being where I was supposed to be. I did come forward but [defendant] had already went to trial and once I saw everybody from the neighborhood there, I got scared and left because I didn't want people to think I was a trick. Now that I'm moved out of the neighborhood I'm willing to testify if called to do so."

While Nash's affidavit explains why he did not want to come forward, it does not explain why defendant or defendant's family did not approach him.

¶ 43        Both Redic and Nash swear in their affidavits that defendant "stepped back" from the victim's vehicle immediately before firing the first shot. These statements contradict defendant's trial testimony that he reached his hand inside the victim's vehicle to fire the first couple of shots at whatever the victim was reaching for on the floor.

¶ 44                                    2. The Trial Court's Second-Stage Ruling

¶ 45        The State then moved to dismiss defendant's *pro se* petition as supplemented by counsel.

¶ 46        At the second-stage hearing, the parties acknowledged that, in order to show actual innocence, defendant had to show that his evidence was: (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result on trial. *People v. Ortiz*, 235 Ill. 2d 319, 333-34 (2009). The State conceded that Redic's and Nash's affidavits, which were submitted in support of defendant's actual innocence claim, were newly discovered. The assistant State's Attorney (ASA) stated that Redic's and Nash's affidavits are "reportedly newly discovered and I have no doubt that they are newly discovered." The ASA repeated: "[T]he case law requires that actual innocence claims be supported by newly discovered information which I grant exist[s] in this case."

¶ 47        However, the State argued that "it's not material" and that it would not have changed the result at trial. The State argued that Redic's and Nash's testimony would not have changed the result at trial because, at most, their affidavits showed mutual combat[3] not self-defense by

---

[3]"Mutual combat" has been defined by our supreme court as a "fight or struggle which both parties enter willingly or where two persons upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125 (1989). See also *People v. Leach*, 2012 IL 111534, ¶ 152 (the offense of first-degree murder may be "mitigated" to second-degree murder if the defendant "killed while under the influence of a sudden, intense passion engendered by mutual combat"); 720 ILCS ILCS 5/9-2(a)(1) (West 2002) (a "mitigating factor" for second-degree murder occurs if defendant is "acting under a sudden and intense passion resulting from

defendant. Defendant testified that he was armed when he approached the victim's vehicle. Redic and Nash both swore in their affidavits that the victim said "Oh, s***" when he observed defendant's approach and then reached for a gun. At most, this chain of events shows aggression by defendant, a self-defense response by the victim, and then shooting by defendant toward the seated victim. The State argued that this chain of events could not possibly serve as the basis for a self-defense claim by defendant.

¶ 48 The trial court again dismissed the petition, ruling (1) that trial counsel was not ineffective for allegedly failing to investigate; and (2) that defendant had failed to make a substantial showing of actual innocence.

¶ 49 The trial court did not rule on whether trial counsel was ineffective for allegedly failing to offer an involuntary manslaughter instruction. In his appellate brief, defendant concedes that: "post-conviction counsel did not argue this error at the hearing on the State's motion to dismiss and did not say anything in his reply to the State's motion to dismiss, when the State failed to address the claim. *** In addition, counsel did not attempt to obtain a ruling on its merits during oral arguments." This appeal followed.

¶ 50                                    ANALYSIS

¶ 51 On this appeal, defendant claims: (1) that he has made a substantial showing that he acted in self-defense and thus is actually innocent; and (2) that his counsel was ineffective (a) for failing to ask for an involuntary manslaughter jury instruction and (b) for failing to investigate or call occurrence witnesses. For the following reasons, we do not find these claims persuasive.

¶ 52                      I. Stages of a Postconviction Petition

¶ 53 Under the Post-Conviction Hearing Act (Act), individuals convicted of a criminal offense may challenge their convictions if there was a violation of their constitutional rights (725 ILCS 5/122-1 *et seq*. (West 2012)). See also *People v. Domagala*, 2013 IL 113688, ¶ 32. The Act provides for three stages of review by the trial court. At the first stage, the trial court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 54 If the trial court does not dismiss a petition at the first stage, the petition advances to the second stage, where counsel is appointed if a defendant is indigent. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-4, 122-5 (West 2012); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the trial court must determine whether the petition and any accompanying documents make a "substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 55 If the defendant makes this showing at the second stage, then the petition advances to a third-stage evidentiary hearing. At a third-stage evidentiary hearing, the trial court acts as fact finder, determining witness credibility and the weight to be given particular testimony and evidence, and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

---

serious provocation by the individual killed *** but he negligently or accidentally causes the death of the individual killed").

¶ 56                                    II. Standard of Review

¶ 57        In this appeal, the trial court dismissed defendant's postconviction petition at the second stage. During a second-stage dismissal hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 58        At this stage, the trial court accepts as true all well-pled facts that are not positively rebutted by the record. *Domagala*, 2013 IL 113688, ¶ 35 (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)). There is no fact finding or credibility determination at this stage. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). As a result, the State's motion to dismiss raises solely the issue of whether the petition is sufficient as a matter of law. *Domagala*, 2013 IL 113688, ¶ 35 (citing *Coleman*, 183 Ill. 2d at 385). The question before the court is whether the petition's well-pled allegations, if proven, would entitle the defendant to relief. *Domagala*, 2013 IL 113688, ¶ 35. Since this is a purely legal question, our review at the second stage is *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 387-89 (1998). *De novo* consideration in the case at bar means that we perform the same analysis that the trial judge would have performed, if we had been sitting during the second-stage dismissal hearing. See *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 59                                    III. Actual Innocence

¶ 60        In this appeal, defendant claims that he is actually innocent of the underlying offense, which is first-degree murder. The wrongful conviction of an innocent person violates due process under the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2) and, thus, a defendant can raise in a postconviction proceeding a freestanding claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009); *People v. Parker*, 2012 IL App (1st) 101809, ¶ 80. See also *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 61        In *Ortiz*, our supreme court held that, to assert a claim of actual innocence based on newly discovered evidence, a defendant must show that the evidence was: (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result on trial. *Ortiz*, 235 Ill. 2d at 333-34; *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001) (citing *People v. Molstad*, 101 Ill. 2d 128 (1984)). See also *Parker*, 2012 IL App (1st) 101809, ¶ 81.

¶ 62        The *Ortiz* court defined newly discovered evidence as "evidence [(1)] that has been discovered since the trial and [(2)] that the defendant could not have discovered sooner through due diligence." *Ortiz*, 235 Ill. 2d at 334.

¶ 63        Defendant claims that Redic's and Nash's affidavits are newly discovered evidence, and the State conceded at the second-stage hearing that the affidavits were newly discovered. On appeal, the State admits in its brief that it made this concession at the second-stage hearing, which is the proceeding we are now reviewing. Relying on the State's representation at the second-stage hearing, the trial court also stated that "these affidavits *** are newly discovered." *Minniefield*, No. 1-08-0649, slip op. at 7.

¶ 64        In addition, a prior panel of the appellate court also held, based on the record before it, that "it is at least 'arguable' that evidence of a gun in the victim's car would have changed the outcome." *Minniefield*, No. 1-08-0649, slip op. at 7. However, the prior panel had before it

only Ratliff's affidavit, and not Redic's and Nash's affidavits which are the subject of defendant's present actual-innocence claim.

¶ 65    The State argued that Redic's and Nash's affidavits would not have changed the result at trial, and the trial court agreed, and so do we. Defendant testified at trial that he was armed when he approached the victim's vehicle. Defendant testified: "I had my gun on the side of me." Redic and Nash both swore in their affidavits that the victim said "Oh, s***" when he observed defendant's approach and then the victim reached for a gun. At most, this chain of events shows aggression by defendant, a self-defense response by the victim, and then shooting by defendant toward the seated victim. This chain of events could not possibly serve as the basis for a self-defense claim by defendant; otherwise, every time a victim responded in self-defense, the aggressor could then claim self-defense and fire.

¶ 66    In addition, Redic's and Nash's affidavits contradict defendant's trial testimony in a crucial respect. Both Redic and Nash swore that defendant "stepped back" from the victim's vehicle and then fired the first shot. By contrast, defendant testified that he reached his gun *inside* the vehicle to fire the first shots, in order to shoot at what the victim was reaching for. Defendant argues that it was this act, of reaching *inside* the vehicle, that resulted in his gun being caught by the window frame when the vehicle moved forward and that caused his gun to accidentally discharge multiple times. Defendant testified that, when the victim "pressed on the gas pedal, *** my hand was still in the car shooting at what I seen him reaching at ***. As he took off, the frame hit the gun and the gun went off." However, if defendant "stepped back" as both Redic and Nash swore under penalty of perjury, then defendant's hand was not inside the vehicle and was not caught by the window frame.

¶ 67    Since defendant's proposed witnesses contradict his trial testimony in key respects, we agree with the trial court that the proffered evidence was not of such a conclusive character that it would probably change the result at trial. *Ortiz*, 235 Ill. 2d at 333-34.

¶ 68                          IV. *Strickland* and Ineffectiveness of Counsel

¶ 69    On this appeal, defendant also claims that his trial counsel was ineffective.

¶ 70    Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must show both: (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced defendant. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 71    To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient

performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 72      Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a trial court may dismiss the claim if either prong is missing. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *People v. Albanese*, 104 Ill. 2d 504, 527 (1984).

¶ 73                                          V. Jury Instruction

¶ 74      Defendant claims that his trial counsel was ineffective in two ways: (1) by allegedly failing to offer a jury instruction; and (2) by allegedly failing to investigate or call a witness.

¶ 75      Defendant claims that his trial counsel was ineffective for failing to request an involuntary manslaughter jury instruction. As a preliminary matter, it is not clear whether defendant waived this issue by failing to obtain a ruling on this particular claim from the trial court which considered his petition during the second-stage proceedings. However, even if the claim was not waived, it would not succeed. Since the prior appellate court which considered defendant's petition after its first-stage dismissal never reached this claim (*Minniefield*, No. 1-08-0649, slip op. at 7), there is no law of the case with respect to this claim.

¶ 76      It is well established in Illinois that a counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of another, is a matter of trial strategy. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16; *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). Our supreme court has stated: "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence," and therefore are "generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

¶ 77      Nonetheless, the failure to request a particular jury instruction may still be grounds for finding ineffective assistance of counsel, if the instruction was so critical to the defense that its omission denied the accused the right to a fair trial. *Falco*, 2014 IL App (1st) 111797, ¶ 16; *People v. Johnson*, 385 Ill. App. 3d 585, 599 (2008) (citing *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)).

¶ 78      In addition, the State concedes in its appellate brief that defendant is correct that the decision whether to request an instruction on a lesser included offense is one for the defendant to make. *People v. Brocksmith*, 162 Ill. 2d 224, 229-30 (1994). Defendant submitted an affidavit in which he states that he asked his counsel to request an involuntary manslaughter instruction.

¶ 79      Defendant argues that, although his counsel asked for and received both a self-defense instruction and a second-degree murder instruction based on unreasonable-belief self-defense, counsel's performance fell below that of a reasonably competent attorney because counsel failed to also request an instruction on involuntary manslaughter.

¶ 80      However, a court may give an involuntary murder instruction only if the instruction is supported "by some credible evidence in the record that would reduce the crime of first-degree murder to involuntary manslaughter." *People v. Sipp*, 378 Ill. App. 3d 157, 163 (2007). "[A] manslaughter instruction should not be given where the evidence shows that the homicide was murder, not manslaughter." *Sipp*, 378 Ill. App. 3d at 163. " '[A] defendant is not entitled to

reduce first degree murder to [involuntary manslaughter] by a hidden mental state known only to him and unsupported by the facts.' " *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007) (quoting *People v. Jackson*, 372 Ill. App. 3d 605, 614 (2007)).

¶ 81    The Criminal Code of 1961 (the Code) defines involuntary manslaughter, in relevant part, as:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." 720 ILCS 5/9-3(a) (West 2002).

¶ 82    "Recklessness" is defined as follows in the Code:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning." 720 ILCS 5/4-6 (West 2002).

¶ 83    "Illinois courts have consistently held that when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless and does not warrant an involuntary-manslaughter instruction, regardless of the defendant's assertion that he or she did not intend to kill anyone." (Internal quotation marks omitted.) *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007).

¶ 84    Here, defendant testified at trial: that he fired two shots inside the victim's vehicle in an attempt to shoot something that the victim was trying to retrieve; that, after firing these two shots, defendant's hand was inside the window of the victim's vehicle; and that, when the victim's vehicle moved forward, the frame in between the driver's window and the back passenger seat hit defendant's gun which then discharged several times.

¶ 85    However, defendant's testimony was contradicted by the physical evidence at trial. At least five bullet casings were found outside the vehicle and on the street, and the casings were all fired from defendant's gun. Police found bullet holes in the driver's side of the vehicle where the victim was sitting. If defendant's gun had discharged inside the vehicle, then there would be no bullet holes in the door or cartridge cases on the street. In addition, the back window behind the driver's seat was shot out. Although the medical examiner made no determination about which bullet was the fatal one and concluded only that the victim died of multiple gunshot wounds, the examiner specifically determined that there was no evidence of close-range firing when he examined the bullet wound on the victim's upper back and that this bullet struck the victim's pulmonary artery and lungs, causing massive bleeding. If defendant's hand was caught by the frame of the driver's window, then this would have been in close range to the driver.

¶ 86    In response, defendant argues in his brief that the fact that defendant's "hand was hit by the window frame when the car moved indicates that it was almost outside the car" and thereby explains the lack of close-range firing. This makes no sense. For defendant's hand to be hit by the window frame as the vehicle moved forward, the hand would have to be inside the driver's window and very close to the driver. Defendant further argues "that the car moved, which

would mean that his hand would have been outside the car for the subsequent shots that hit the car's exterior" and which thereby explains why the shots hit the vehicle's exterior and the cartridges were found outside the vehicle. However, if defendant's hand was outside the vehicle for the subsequent shots, then the vehicle's movement could not have been causing the gun to accidentally discharge, thereby contradicting defendant's claim of accidental and reckless discharge.

¶ 87 Since the record lacked credible evidence supporting defendant's claim of merely reckless conduct, defendant suffered no prejudice from trial counsel's alleged failure to request an involuntary manslaughter instruction. To establish the prejudice prong of the *Strickland* test, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36. Since the record lacks credible supporting evidence, there is not a reasonable probability that the result of the trial would have been different. Since we conclude that defendant was not prejudiced by the alleged error, we may dismiss on that basis alone without further analysis. *Graham*, 206 Ill. 2d at 476; *Albanese*, 104 Ill. 2d at 527.

¶ 88 However, we find, in addition, that counsel's performance did not fall below an objective standard of reasonableness "under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. For example, in *People v. Shamlodhiya*, 2013 IL App (2d) 120065, the appellate court held that a trial counsel's decision to focus on self-defense instead of involuntary manslaughter during closing argument did not render his performance ineffective. In *Shamlodhiya*, counsel argued in closing that he considered involuntary manslaughter to be " 'a compromised verdict,' " and he did " '[not] want a compromised verdict,' " because this was solely " 'a case of self defense.' " (Internal quotation marks omitted.) *Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 6. In *Shamlodhiya*, the appellate court found that "[c]ounsel credibly explained" why he did not argue for involuntary manslaughter in the alternative. *Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 22. Counsel explained "that arguing for involuntary manslaughter would have undermined the credibility of his attempt to secure an acquittal based on self-defense, which *** would have been the best possible result for defendant." *Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 22. The *Shamlodhiya* case does differ from our case because, in *Shamlodhiya*, the appellate court found that the involuntary manslaughter instruction was still before the jury (*Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 23), whereas in our case counsel took this same strategy one step further and chose not to ask for the instruction at all.

¶ 89 However, this decision, to not request the instruction at all, does not make the decision less of a strategy decision; and reasonable strategy decisions, even if ultimately unsuccessful, do not make an attorney's performance fall below prevailing norms. *People v. Odie*, 151 Ill. 2d 168, 172-74 (1992) (a defense strategy is not constitutionally defective if unsuccessful); *People v. Chapman*, 262 Ill. App. 3d 439, 451 (1992) ("the fact that a defense tactic was unsuccessful does not retrospectively demonstrate incompetence").

¶ 90 Thus, even if defendant did not waive his claim of ineffectiveness based on the failure to request an involuntary manslaughter instruction, we would not find it persuasive, because it does not satisfy either prong of the *Strickland* test.

¶ 91                                         VI. Failure to Investigate

¶ 92 Defendant also claims that his counsel was ineffective for failing to investigate and call a witness, Thomas Ratliff, who swore that he observed a silver gun on the floor of the victim's

- 15 -

vehicle. "The law-of-the-case doctrine prohibits the reconsideration of issues that have been decided by a reviewing court in a prior appeal" (*In re Christopher K.*, 217 Ill. 2d 348, 363 (2005)), and thus it is the law of the case, based on the record then before the appellate court, that it was "at least 'arguable' that evidence of a gun in the victim's car could have changed the outcome." *Minniefield*, No. 1-08-0649, slip op. at 7. However, there are differences between the case that was before the prior panel and the case that is before us. First, the burden of proof on defendant is different. At the first stage, all he had to show was that his claim was not frivolous. 725 ILCS 5/122-2.1(a)(2) (West 2012); *Domagala*, 2013 IL 113688, ¶ 32. By contrast, at the second stage, the burden is on defendant to make a "substantial showing of a constitutional violation." *Edwards*, 197 Ill. 2d at 246.

¶ 93    Second, the record before us includes documents that were not before the prior panel, namely, Redic's and Nash's affidavits and Ratliff's second affidavit, and we may consider those in addition. In conducting a second-stage review, we must consider both "the petition and any accompanying documentation" (*Domagala*, 2013 IL 113688, ¶ 33), and "[w]e may affirm the dismissal of a postconviction petition on any basis supported by the record" (*People v. Rivera*, 2014 IL App (2d) 120884, ¶ 8). Thus, the record before the prior panel is not the same as the record before us.

¶ 94    The record contains two handwritten "Affidavit[s]" signed by "Thomas Ratliff." The first, which was submitted by defendant with his *pro se* petition, is undated; and the second, which was submitted by counsel on April 25, 2012, is dated September 6, 2007. Although the two documents relate substantially the same information, they are not the same, since the first has more detail than the second.

¶ 95    The first undated "Affidavit" states that defense counsel obtained Ratliff's information and "said he was going to call me before trial but never did so?" In this first document, Ratliff wrote a question mark which does not appear in the second document. It is unclear whether this first question mark means that Ratliff was unsure of this fact.

¶ 96    In the first "Affidavit," Ratliff states that he heard gunfire and observed the murder victim in a vehicle which had crashed into another vehicle. Ratliff observed that a female passenger "was shot" but his affidavit does not state that the murder victim was shot. Ratliff then relates that "one of the guys by the car" removed a silver gun off the front passenger-seat floor before the police arrived.

¶ 97    By contrast, the second affidavit makes no reference to the murder victim and describes the crashed vehicle by its color rather than as the victim's vehicle. Without any reference to the victim, the second affidavit, if read by itself, could be describing any "tan or brown car" that "crashed into another car" near 44th Place on December 17, 2002. Unlike the first affidavit, the second affidavit does not mention that a female passenger had been shot. The second affidavit also does not mention a "guy[ ] by the car." Instead it states that Ratliff "saw three guys *** in the tan car while one of the guys took a silver looking gun off the front passenger floor."

¶ 98    Defendant has not made a substantial showing that there is a reasonable probability that, but for counsel's alleged failure to call Ratliff, the result of his trial would have been different (*Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694)) where, as we explained above, defendant's testimony was contradicted by the physical evidence at trial. *Supra* ¶ 85. In addition, defendant's own proposed witnesses also contradict his version of events. *Supra* ¶¶ 66-67.

¶ 99                              CONCLUSION

¶ 100       For the foregoing reasons, and after a *de novo* review, we affirm the trial court's second-stage dismissal of defendant's *pro se* postconviction petition as supplemented by counsel. We do not find persuasive defendant's claims: (1) that he has made a substantial showing that he acted in self-defense and thus is actually innocent; or (2) that his counsel was ineffective (a) for failing to ask for an involuntary manslaughter jury instruction or (b) for failing to investigate or call occurrence witnesses.

¶ 101       Affirmed.