2022 IL App (1st) 201111-U
Order filed: June 23, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-20-1111

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 97 CR 19288 |
| | ) | |
| LEONARD LOGAN, | ) | Honorable |
| | ) | James Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant was granted leave to file a successive postconviction petition raising various claims related to alleged *Brady* violations, ineffectiveness of counsel, and actual innocence. At the second stage, the court dismissed all the claims except for one claim of actual innocence, which was advanced to a third-stage hearing. Following the hearing, the court denied defendant's actual innocence claim. On appeal, we affirmed the second-stage dismissal and third-stage denial of defendant's postconviction claims.

¶ 2    A jury convicted defendant, Leonard Logan, of first-degree murder and the trial court sentenced him to 45 years' imprisonment. On direct appeal, this court affirmed with one justice dissenting. *People v. Logan*, 352 Ill. App. 3d 73 (2004). On postconviction review, the circuit court

denied his petition but subsequently granted him leave to file a successive petition, alleging newly discovered evidence of actual innocence predicated on one of the arresting officer's history of misconduct and on the testimony of a witness who claimed to see someone other than defendant commit the shooting. Defendant also brought claims of ineffective assistance and violations of *Brady v. Maryland*, 373 U.S. 83 (1963). The cause proceeded to the second stage, where the court dismissed all of his claims except for the actual innocence claim predicated on the new witness who claimed to see someone other than defendant shoot the victim. The court subsequently conducted a third-stage evidentiary hearing and then denied defendant's claim of actual innocence. On appeal, defendant argues that the court erred during the successive postconviction proceedings when: (1) it dismissed his actual innocence claim predicated on the officer's prior history of misconduct; (2) denied his actual innocence claim predicated on the new witness to the shooting; and (3) refused to allow him to supplement his actual innocence claim with a 911 recording containing a description of the shooter that did not match him. For the reasons that follow, we affirm.

¶ 3    Testimony at defendant's jury trial established that on March 18, 1997, between 11 and 11:30 p.m., L.C. Robinson was driving north on Yates Boulevard in Chicago. As he crossed through the intersection at Yates Boulevard and 75th Street, he saw his friend, Charles Jenkins, talking on a pay phone at a gas station located on the corner of that intersection. He also saw the victim, Timothy Jones, talking on a second pay phone. Robinson watched as a heavy-set black man about five feet nine inches tall exited a sport utility vehicle (SUV), approached the pay phones, pulled a gun from his waistband and shot the victim in the head. The victim fell to the ground and then the shooter fired two or three more shots at other people in the vicinity.

¶ 4     Robinson watched as the shooter entered the front passenger side of the SUV, which then drove down 75th Street. Robinson dialed 911 and gave the operator the vehicle's license plate number.

¶ 5     The Chicago police traced the license plate to a rental car agency and determined that the SUV had been rented to an L. Payton. Detectives Alejandro Almazon, William Higgins and Edward O'Boyle went to the apartment of Latonya Payton at approximately 6:30 p.m. on March 19, 1997. The detectives first asked Payton about two men they had seen in the hallway as they approached her apartment. Payton denied knowing the men. The detectives then asked Payton about the SUV. Payton told them that she had rented it and that it had been parked in front of her building from the evening of March 18, 1997, to March 19, 1997. When the detectives told Payton that the SUV was involved in a shooting, she again told them that it had been parked in front of her building and she had no knowledge of what they were talking about.

¶ 6     The detectives asked Payton about the beer bottles and the two large pizzas in her apartment and she admitted that the two men seen walking down the hallway were friends of hers and had been in her apartment. Payton told the detectives that another friend of hers borrowed the SUV on March 18, but this person was not either of the two men who had just left her apartment. The detectives told her that the shooting was a homicide and Payton agreed to go to the police station to speak with them about the shooting.

¶ 7     At the police station, Payton initially stated that a man named Rodman borrowed the SUV on the night of the murder and returned it 20 minutes later. Payton later stated that Rodman and defendant borrowed the SUV on the night of the murder and returned with it at approximately 2 a.m. Payton eventually gave a different statement implicating defendant. During this statement, Payton told the detectives that, on March 18, 1997, defendant was driving the SUV down 75th

Street, while she sat in the front seat and Rodman sat in the backseat. They were approaching Yates Boulevard when defendant pulled into a gas station and exited the SUV. He pulled a gun out of his waistband and started shooting at a man who was on the telephone. Defendant then turned, shot down the alley at another person, entered the vehicle and sped away. Defendant drove to Stateway Gardens, where he went into one of the apartment buildings and returned after about 10 minutes. Defendant had changed his clothes and he no longer had the gun with him.

¶ 8     Payton commemorated this account in a handwritten statement to Assistant State's Attorney (ASA) Kent Sinson at approximately 7:50 a.m. on March 21, 1997. Payton subsequently testified before the grand jury consistent with her statement.

¶ 9     At trial, Payton testified that her grand jury testimony and her written statement were coerced by the officers' threats to charge her with the murder unless she implicated defendant. Payton also testified that the officers prevented her from eating or sleeping for three days until she agreed to make the statement implicating defendant. The officers testified that Payton was not threatened with being charged for the murder and that no one ever told her the facts or any details surrounding the shooting of the victim.

¶ 10     To rebut Payton's claim that her written statement and grand jury testimony were coerced by the officers' threats to charge her with the murder, the State sought to elicit testimony from her that she made her written statement and testified before the grand jury only after being confronted with the results of two polygraph examinations. Following a sidebar outside the presence of the jury, the court ruled that this testimony was admissible.

¶ 11     Payton subsequently testified that, after confronting her with the results of the second polygraph examination, the officers told her to make a statement implicating defendant. The State did not question Payton about the results of the polygraph tests and she never specifically testified

what the results of the polygraph tests were. The court orally instructed the jury that the testimony concerning the polygraph was to be considered only with regard to how the police conducted their investigation and why they asked certain questions of the witness.

¶ 12    Charles Jenkins testified he was talking on a pay phone next to the victim at the gas station at 75th Street and Yates Boulevard on March 18, 1997, at about 11:30 p.m., when a truck pulled in and stopped five or six feet away from them. A young man exited the truck and walked toward them as though he was going to use a pay phone. Jenkins kept turning to look at the man as he approached and he saw the man pull a gun and shoot the victim in the head. Jenkins then dropped the phone and started to run through an alley, when he was shot in the back by the same man who shot the victim. At trial he described the shooter as 5 feet 6 inches or 5 feet 7 inches tall and 160 to 170 pounds. Jenkins testified that the shooter's complexion was darker than his own and that defendant is not the man who shot him.

¶ 13    The State presented evidence that police removed two compact discs (CDs) and three CD cases from the SUV. A fingerprint on one of the CD cases belonged to defendant. Defendant's fingerprint was on one of the beer bottles that was in Payton's apartment on March 19.

¶ 14    Chicago police officer Hasan Al–Amin testified that defendant was arrested on June 20, 1997.

¶ 15    The jury convicted defendant of first-degree murder.

¶ 16    During the sentencing hearing, Officer Glenn Evans testified to a prior incident on November 17, 1996, when he was assigned to locate defendant, who was wanted for aggravated assault. Evans located defendant in a Chicago Housing Authority building and went over to defendant and identified himself as a police officer and said he wanted to talk. Defendant ran up a flight of stairs and Evans followed. Defendant turned around and punched Evans and they began

wrestling. During the struggle, Evans took out his gun and pointed it at defendant. Defendant grabbed the gun out of Evans's hand. Evans punched defendant and recovered the gun. They continued to fight and Evans shot defendant one time in the groin. Defendant ran up a second flight of stairs and Evans shot him in the forearm. Other officers arrived and they subdued him. Defendant subsequently filed a lawsuit in federal court against Evans arising out of the shooting, but the case was dismissed.

¶ 17    The trial court sentenced defendant to 45 years' imprisonment[1]. Defendant filed a posttrial motion alleging that his trial counsel was ineffective for failing to call his sister, Earlene Logan, and his half-sister's aunts, Princess Thomas and Chevelle Thomas, who purportedly would have provided alibi testimony that he was in Milwaukee at the time of the shooting. The circuit court held an evidentiary hearing during which defendant's lead trial counsel, Martin Kelly, testified that he spoke with Chevelle and Princess Thomas and ultimately decided not to call them to testify to defendant's alibi. Kelly gave several reasons for his decision, including his belief that the jury would not find the alibi witnesses credible and would blame the defense for failing to prove the alibi.  The court denied defendant's posttrial motion.

¶ 18    Defendant filed a direct appeal, arguing that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the State made improper remarks during closing argument; (3) the State failed to prove he was fit for trial; and (4) his trial counsel provided ineffective assistance by failing to call the alibi witnesses who would have testified he was in Milwaukee at the time of the murder and by forcing him to waive his right to testify. We affirmed defendant's conviction and one justice

----

[1] Defendant remained incarcerated through the filing of the subsequent postconviction petition at issue here and was released from prison on mandatory supervised release in November 2019.

dissented. See *Logan*, 352 Ill. App. 3d 73. The Illinois Supreme Court denied defendant's petition for leave to appeal. *Logan*, 212 Ill. 2d 545 (2004).

¶ 19     Defendant filed a petition for postconviction relief and raised five claims: (1) his appellate counsel denied him effective assistance by failing to raise meritorious issues; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) Payton's statements were improperly admitted into evidence in violation of section 115–10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2000)); (4) his trial counsel denied him effective assistance by failing to present the testimony of the alibi witnesses and by forcing him to waive his right to testify; and (5) his right to due process was violated by the State's closing argument.

¶ 20     Defendant subsequently filed a supplemental petition for postconviction relief, with the following additional claims: (1) his rights to a fair trial and due process were violated where evidence of Payton's polygraph examinations was repeatedly introduced, the results of the polygraph exams were made clear to the jury, and no written limiting instruction was given; (2) trial counsel denied him effective assistance by failing to tender a written limiting instruction; (3) appellate counsel denied him effective assistance by failing to raise arguments regarding the improper admission of the polygraph examination and trial counsel's failure to tender a written limiting instruction; (4) trial counsel denied him effective assistance by his opening statement and closing arguments and appellate counsel denied him effective assistance by failing to raise this issue on appeal; (5) trial counsel denied him effective assistance by failing to present evidence that at the time of the shooting, a caller to 911 gave a description of the shooter that did not match him; and (6) the cumulative errors of trial counsel denied him effective assistance.

¶ 21     The State filed a motion to dismiss the petitions. The postconviction court granted defendant a new trial based on the admission of the polygraph evidence without any written

limiting instruction. The court also stated that trial counsel's failure to call the alibi witnesses factored into the decision to grant a new trial. The State appealed. We reversed and remanded, holding that the court had erred by granting defendant a new trial at the second stage of postconviction proceedings without giving the State an opportunity to file an answer and without conducting an evidentiary hearing. See *Logan,* No. 1–07–1478 (2008) (unpublished order under Supreme Court Rule 23). On remand, the case was assigned to a different judge.

¶ 22    Defendant filed a motion to clarify the scope of the evidentiary hearing arguing that he should be allowed to pursue all of his postconviction claims. The postconviction court limited the hearing to a consideration of: (1) defendant's claims of ineffective assistance of trial and appellate counsel with respect to the admission of the polygraph evidence and the failure to submit written limiting instructions; and (2) defendant's claim of ineffective assistance of trial counsel for his failure to call the alibi witnesses. Following the evidentiary hearing, the postconviction court denied defendant's petition. Defendant appealed. We affirmed. See *Logan*, 2011 IL App (1st) 093582. The Illinois Supreme Court denied defendant's petition for leave to appeal. *Logan*, 962 N.E.2d 486 (2011).

¶ 23    In August 2012, defendant filed a petition for a writ of *habeas corpus* in federal district court. Defendant alleged that his trial counsel provided ineffective assistance by: coercing him into not testifying; making a promise to the jury during opening statements that he would call alibi witnesses, but then failing to call those witnesses at trial; failing to offer into evidence the recording of a 911 call on the night of the shooting that provided a description of the shooter that did not match him; and failing to seek a written instruction limiting the jury's consideration of the polygraph evidence. Defendant also alleged that: he was denied a fair trial by the trial court's admission of evidence that Payton failed a polygraph exam; he was not proved guilty beyond a

reasonable doubt; and appellate counsel provided ineffective assistance by failing to raise meritorious issues. The district court denied all of defendant's claims except for the claim that counsel was ineffective for failing to deliver on his promise to present alibi witnesses. See *United States ex rel. Logan v. Chandler*, 999 F. Supp. 2d 1047 (N.D. Ill. 2013). The district court ordered an evidentiary hearing on that claim. *Id.* at 1085.

¶ 24     The district court conducted the evidentiary hearing but stayed its ruling pending the outcome of defendant's successive postconviction petition at issue here.

¶ 25     On February 25, 2015, defendant filed a motion in the circuit court for leave to file a successive postconviction petition. In his successive petition, defendant asserted a claim of actual innocence based on the affidavit of a newly discovered witness to the shooting, Erven Walls. Walls attested in his affidavit that on the night of the shooting, March 18, 1997, he was at a barbecue stand with a woman on the southeast corner of the intersection of Yates Boulevard and 75th Street. This part of town was controlled by the Blackstones and was nicknamed "Terror Town." Walls, who was a member of the Gangster Disciples (GD), saw a fellow GD member, Kenneth Mosby[2], in the passenger seat of a vehicle that pulled into a gas station across from the barbecue stand. Mosby was "a 'UFO' or 'hitter', part of a crew who took care of gang business that related to shootings and security." Mosby "was easily identifiable at the time as a very short 17-18 year old. He was around 5'6" to 5'8", had 'bubble eyes', and had one cross-eye." The driver of the car was a woman named Tonya, who "hung out" with the GDs.

---

[2] Defendant appended Mosby's criminal records and a federal RICO plea agreement filed on August 27, 2015, in *United States v. Byron Brown*, No. 13-CR-774, with an August 12, 2014, proffer letter stating that Brown agreed to admit to participating in Mosby's murder.

¶ 26    Walls drove over to the gas station to talk with Mosby about gang-related business. Walls saw Mosby exit his vehicle and fire a gun into a crowd of people who were standing at some pay phones. One man ran off into the alley, and Mosby shot at him before running back to his vehicle and entering the passenger side and driving away. Walls drove away in the opposite direction. At that time, Walls did not know that anyone had been seriously injured by the shooting.

¶ 27    Subsequently, in January 1998, Walls was at Tonya's apartment along with Mosby. Mosby brought up the shooting and said that it was "taken care of" because Tonya had talked to the police "and put the shooting on some guy."

¶ 28    In addition to asserting his actual innocence based on Walls's affidavit, defendant also asserted his actual innocence based on newly discovered evidence that Officer Evans, who participated in his arrest and testified at his sentencing, had a previously unknown pattern of using excessive force when making arrests. Evans had 48 complaints against him as of the date of defendant's arrest, none of which were known to the public until the Chicago Tribune published articles about those complaints in 2014.

¶ 29    Defendant contended that about a year and a half before the shooting in this case, he had numerous interactions with Evans, who harassed and threatened him. On November 17, 1996, Evans shot defendant during a struggle. Defendant filed a complaint with the Office of Professional Standards (OPS) about the shooting and filed a civil rights lawsuit in federal court seeking redress. Defendant contended that his complaint and civil rights lawsuit gave Evans a motive for framing him for the shooting here, and that the evidence of the numerous complaints against Evans showed his capability of engaging in such an effort to frame him for a shooting he did not commit.

¶ 30    Defendant further asserted that he was actually innocent based on his belief that: 911 calls on the night of the shooting gave a description of the shooter that did not match him, but more

closely matched Mosby; "cell phone records" from Payton's SUV shows that he was not in the vehicle at the time of the shooting; and more detailed fingerprint testing of the SUV shows that he was never in the vehicle. Defendant admitted that he was not in possession of the 911 recordings or the cell phone records or the more detailed fingerprint evidence and thus had no proof substantiating any of these allegations.

¶ 31    Defendant also claimed that the State committed *Brady* violations by failing to disclose Evans's pattern of excessive force and by failing to disclose that the police had coerced Payton into incriminating him for the murder.

¶ 32    Finally, defendant alleged in his successive postconviction petition that his trial counsel provided ineffective assistance by: failing to properly investigate his alibi; failing to properly investigate Evans's role in framing him for the shooting and failing to uncover his pattern of misconduct; failing to introduce evidence of a 911 call that gave a description of the shooter as weighing about 125 pounds, which did not match defendant's weight of about 200 pounds; failing to investigate who owned the cell phone recovered from Payton's SUV; and failing to investigate why his fingerprints were located on the CD case in the SUV but were not located anywhere else on the vehicle.

¶ 33    Defendant argued that even if each individual error was not sufficiently prejudicial to warrant relief, their cumulative effect deprived him of a fair trial.

¶ 34    The postconviction court granted defendant leave to file his successive petition. The State subsequently filed a response to the petition, requesting an evidentiary hearing on the actual innocence claim based on Walls's affidavit, and moved to dismiss the remaining allegations. The court ordered an evidentiary hearing on defendant's actual innocence claim predicated on Walls's affidavit.

¶ 35    The court dismissed defendant's remaining claims. With respect to his actual innocence and *Brady* claims predicated on Evans's pattern of excessive force, the court found that Evans only played a "minimal" role in the investigation of this case, was not involved in Payton's interrogation, and was not alleged to have used any excessive force. Accordingly, the court found that defendant failed to make a substantial showing that Evans's history of excessive force was material or exculpatory here for purposes of *Brady* or that it showed defendant was actually innocent.

¶ 36    With respect to defendant's *Brady* claim predicated on the State's alleged withholding of evidence that the police coerced Payton into identifying him as the shooter, the court found that this claim was forfeited as it could have been brought in the initial petition. The court also found that, forfeiture aside, defendant failed to make a substantial showing that Payton had been coerced.

¶ 37    The court found that defendant forfeited all of his ineffective assistance of counsel claims with respect to counsel's failures to:  investigate his alibi; investigate Evans's role in framing him for the shooting; introduce evidence of a 911 call; investigate the ownership of the cell phone; and investigate the fingerprint evidence. The court determined that these claims could have been raised in his initial petition. The court also found no ineffective assistance related to his claim that counsel should have uncovered Evans's prior acts of excessive force, as he was not prejudiced thereby. The court found no cumulative error.

¶ 38    The cause proceeded to an evidentiary hearing on defendant's claim of actual innocence predicated on Walls's affidavit claiming that he saw Mosby commit the shooting.

¶ 39    Walls testified that he was currently in prison for armed robbery, armed violence and aggravated kidnapping. He could not remember the date of his offenses but remembered that he was arrested in September 1997 and that his parole date is September 17, 2022.

¶ 40    Prior to his arrest, Walls was living on the north side of Chicago in the "5800 block." He had grown up with Mosby and they were both members of the GDs. Walls described Mosby's role in the GDs as a "UFO," meaning that he was a "punisher" who shot persons who interfered with gang business.

¶ 41    Mosby was about five feet six or five feet seven and weighed around 150 pounds, with a "low haircut" and "bubble eyes." Mosby went by the nickname "Duck" when he was younger, but when he became a teenager he went by the nickname "Dino." Walls gave inconsistent testimony regarding when he learned Mosby's actual name. Walls indicated in some of his testimony that he was aware of Mosby's actual name when they were kids, but in other portions of his testimony he indicated that he only knew Mosby by his nicknames and did not learn his actual name until he spoke with the assistant State's Attorney about this case in 2014.

¶ 42    Walls witnessed Mosby commit the shooting at the gas station at 75th Street and Yates Boulevard on March 18, 1997. Walls was sure of the date of the shooting because that was the day when the GDs gathered at the Willie Mays lounge on 75th Street and Dorchester Avenue and planned a large picnic and discussed "nation business." Walls remembered borrowing a 1987 Cutlass belonging to the GDs and driving to the Willie Mays lounge at about 9 p.m. on that day and meeting up with a young woman he only knew as "Baby Girl." She wanted some barbecue, so Walls drove her to a restaurant on the corner of Yates Boulevard and 75th Street at about 11 p.m. Baby Girl went inside the restaurant while Walls stayed in the automobile.

¶ 43    As he was waiting, Walls saw a black truck pull into the gas station at 75th Street and Yates Boulevard and park on the side of the building. Tonya was the driver. Mosby was the passenger. Walls needed to speak with Mosby about some gang-related business, so after Baby Girl came out of the restaurant, he drove over to the gas station and stopped "in the middle of the pumps." Before

Walls even had the chance to exit his automobile and say anything to Mosby, he saw Mosby exit the passenger side of the truck and shoot at a crowd of about five or six people standing by some pay phones. Walls did not see defendant at the gas station. The crowd dispersed as the shots were fired, and Walls drove away from the scene.

¶ 44    About three months later, in late June or early July 1997, Walls went to Mosby's and Tonya's apartment. Mosby told Walls not to worry about the shooting because the police had told Tonya who to identify as the shooter. The person identified by Tonya was now under arrest and therefore there was "no need to even discuss" the shooting anymore.

¶ 45    Walls subsequently saw defendant at the library in the Dixon Correctional Center (Dixon) in 2014 and heard him state that he had been convicted of the shooting at the gas station. Walls knew that defendant was innocent because Mosby was the shooter, so he decided to file an affidavit and testify on defendant's behalf.

¶ 46    Following Walls's testimony, postconviction counsel filed a motion to supplement his successive postconviction petition. At the hearing on the motion, postconviction counsel argued that the State had just located some audiotapes of a 911 recording from the Office of Emergency Management and Communications (OEMC) that it had given to counsel for review. The 911 recording previously had been tendered to trial counsel during discovery but had not been introduced at trial, and then it went missing after trial until discovered by the State during these supplementary proceedings. Postconviction counsel stated that he had listened to the 911 recording and discovered it includes a series of police radio communications from the night of the shooting. The recording (which is contained in the record on appeal) begins with a description and license plate of the vehicle used by the shooter, observed by someone who was driving past when the shooting occurred. At 3:46 of the recording, the responding officers ask dispatch if there has been

a description of the shooter, and dispatch responds no. At 5:10 of the recording, Unit 344 asks to give a flash message over the air. Dispatch agrees, and Unit 344 gives a flash message for the "offender wanted for this shooting on Yates. He's *** a male black, 5'7", 130 pounds, dark skinned. He has a black skull cap, black coat, black and white Air Jordan gym shoes."

¶ 47 Postconviction counsel argued that the 911 recording was relevant and material to the claims of actual innocence and ineffective assistance of trial counsel because the description of the shooter in the flash message differed from defendant; the officers give a description of the shooter as weighing about 130 pounds, while defendant weighed closer to 200 pounds. Postconviction counsel admitted that he did not know the identity of the person who gave the description used by the officers in their flash message and that he would like to "put these officers on the stand and try to figure out where this flash message came from." The court responded that the 911 recording was about 20 years old and that it did not believe that the officers would remember the identity of the person who had given them the description as "they didn't attribute [the description] to any individual at the time."

¶ 48 The State argued that the 911 recording was not newly discovered for purposes of an actual innocence claim, as it had been tendered to trial counsel during discovery and thus was available to the defense during trial. The State further argued that defendant could have raised in his initial petition that his trial counsel was ineffective for failing to introduce the 911 recording into evidence. The State contended that defendant has failed to show cause for why he did not raise the ineffectiveness claim in his initial petition and therefore he has not met the cause and prejudice test for admission of the 911 recording in support of his claim of ineffective assistance.

¶ 49 The court denied the motion to supplement the successive petition, finding that the 911 recording was not newly discovered evidence as it was available to defense counsel at trial and

therefore was not admissible to support his postconviction claim of actual innocence. The court also found that defendant failed to satisfy the cause and prejudice test for admission of the 911 recording in support of his claim of ineffective assistance.

¶ 50    The third-stage evidentiary hearing resumed, the court admitted defendant's exhibits, including Walls's affidavit, and defendant rested.

¶ 51    Daniel Brannigan, an investigator for the State's Attorney's office, testified in rebuttal that on April 4, 2016, he and ASA Brian Boersma went to Dixon and interviewed Walls about the shooting. Walls did not remember the date of the shooting but believed that it occurred during warm weather because he remembered being in the automobile with the windows up and the air conditioning turned on. Walls stated that on the night of the shooting he went "clubbing" at some lounges in the area of 75th Street and picked up a young woman who he nicknamed Baby Girl. At about 8 p.m., Walls drove Baby Girl to a barbecue restaurant on 75th Street and waited for her in his automobile while she went inside. As he was waiting, Walls saw a dark colored SUV driven by an unknown African American female pull into the nearby gas station. A man who Walls knew only as Duck was a passenger in the SUV. Walls did not know Duck's real name.

¶ 52    When Baby Girl returned to his automobile, Walls drove to the gas station to speak with Duck. Walls did not get the opportunity to speak with Duck, though, because "the shooting started almost immediately." As soon as the shooting started, Walls left the gas station.

¶ 53    Following Brannigan's testimony, the State rested. The court heard arguments by both sides and denied defendant's actual innocence claim. The court stated that the issue before it was whether Walls's testimony probably would change the result on retrial. The court found that Walls's testimony was incredible and would not change the result here from a guilty verdict to an acquittal. In finding Walls's testimony to be incredible, the court focused on a number of factors:

that he was subject to impeachment by his prior convictions for armed robbery, armed violence, and aggravated kidnapping; that he gave inconsistent testimony regarding whether or not he knew Mosby's real name at the time of the shooting and whether Mosby saw him at the scene of the shooting; that he could not remember the date of his own offenses but remembered the exact date of the shooting at issue here; that he gave an improbable statement that on the day of the shooting, the GDs decided to hold a picnic planning session in a rival gang's territory; that he gave an improbable account of driving from his address on the north side of the city through heavy congestion to the far southeast side on the night of the shooting; and that he did not remember Baby Girl's actual name or the owner of the automobile he allegedly drove on the night of the shooting.

¶ 54    The court stated "the testimony of Walls, there wasn't a shred of credibility. It was orchestrated." The court discussed Walls's possible motive for giving false testimony:

> "There's a *** possible motive for Mr. Walls. Financial gain. The possibility of inmates getting together, testifying in these postconviction-related matters as to their actually having been at the scene of many of these crimes, if someone possibly gets a new trial, oftentimes there's going to be a civil suit filed. *** There's certainly the possibility of a judgment or if nothing else a settlement that the testifying party could be a beneficiary of. *** [T]his trend of inmates at the Illinois Department of Corrections coming forward and testifying about a fellow inmate and having witnessed the offense that their fellow inmate is doing time for is happening so frequently that it's certainly not novel and it obviously raises suspicions."

¶ 55    However, the court also stated, "You judge each one on its own. It's only fair. *** I don't judge Mr. Walls's testimony on anybody else's or any other situations like this, but this repetitive behavior, certainly something that everyone needs to at least be aware of."  The court concluded:

"Walls was totally lacking in credibility based on his prior convictions, based on his demeanor on the witness stand, based on the impeachment, and his flip-flopping on important issues, which I've tried to address in my finding here. So *** given the introduction of Walls's testimony, were there to be a new trial, would that create the probability that [defendant] would not be convicted? I find that it does not. The petition, and issues raised in the postconviction petition as to actual innocence, that petition is denied."

¶ 56    Defendant now appeals the denial of his successive postconviction petition.

¶ 57    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)) provides a method by which defendant can assert that his conviction resulted from a substantial denial of his constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Under the Act, a postconviction proceeding not involving the death penalty contains three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996).  At the first stage, the court must independently review the petition within 90 days of its filing and shall dismiss it if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a) (West 2020).

¶ 58    If the petition survives first-stage dismissal, it advances to the second stage, where counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition. *Id.* § 122-4, § 122-5. At this stage, the court must determine whether defendant has made a substantial showing of a violation of his constitutional rights. *People v. Domagala*, 2013 IL 113688, ¶ 33. All well-pleaded facts that are not positively rebutted by the original trial record

are taken as true and the court does not engage in fact-finding or credibility determinations nor resolve any evidentiary questions. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 90. Our review of a second-stage dismissal is *de novo*. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 58.

¶ 59     If the petition advances to the third stage, the court will conduct an evidentiary hearing. 725 ILCS 5/122-6 (West 2020). At the third-stage hearing, the court acts as a fact-finder, making credibility findings, determining the admissibility of evidence, and weighing the evidence. *People v. Reed*, 2020 IL 124940, ¶ 51; *Velasco*, 2018 IL App (1st) 161683, ¶ 118. Accordingly, we review the court's decision for manifest error. *Reed*, 2020 IL 124940, ¶ 51. Manifest error is " 'clearly evident, plain, and indisputable.' [Citation.] Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98. We apply the manifestly erroneous standard in recognition of "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 384 (1998).

¶ 60     The Act contemplates the filing of a single petition. *People v. McCoy*, 2020 IL App (1st) 161199, ¶ 15. Successive petitions are disfavored. *Id.* There are two exceptions where fundamental fairness compels the lifting of the bar against successive petitions. *People v. Taliani*, 2021 IL 125891, ¶ 55. The first exception is when defendant establishes cause and prejudice under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2020)) for failing to raise the claim earlier.

¶ 61     Under the cause and prejudice test, defendant must establish cause for his failure to raise the claim earlier and prejudice stemming from his failure to do so. *Id.* Defendant shows cause by identifying an objective factor that impeded his ability to raise a specific claim during the initial

postconviction proceedings. *People v. Wrice*, 2012 IL 111860, ¶ 48. Defendant shows prejudice by demonstrating that the claim so infected the trial that his resulting conviction or sentence violated due process. *Id.*

¶ 62    The second exception for relaxing the bar against successive petitions is when defendant asserts a fundamental miscarriage of justice based on actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. To succeed on a claim of actual innocence, defendant must present newly discovered, material, noncumulative evidence that is so conclusive that it probably would change the result on retrial. *Id.* ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that defendant could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material when it is relevant and probative of defendant's innocence. *Id.* Noncumulative evidence adds to the information that the jury heard at trial. *Id.* Finally, the conclusive character element requires defendant to present evidence placing the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 56. New evidence is conclusive when, after considering it along with the evidence at trial, a different result probably would occur. *Id.* ¶ 47. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* ¶ 48.

¶ 63    Our supreme court also has held that the actual innocence claim must be free-standing, meaning that the newly discovered evidence is not being used to supplement an assertion of a constitutional violation at trial. *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998).

¶ 64    In the present case, the postconviction court granted defendant leave to file a successive petition asserting a claim of actual innocence premised on Walls's new testimony and then denied that claim after a third-stage evidentiary hearing. Defendant contends that the postconviction court erred when it denied his claim of actual innocence raised in his successive petition.

¶ 65    Defendant begins his argument by asserting that the prior evidence of his guilt presented at his jury trial was "stunningly weak." Such evidence included Payton's written statement and grand jury testimony identifying defendant as the shooter. According to this account of the shooting, Payton was a passenger in the SUV that defendant was driving on March 18, 1997. Defendant drove the SUV to a gas station at 75th Street and Yates Boulevard, exited the vehicle, pulled a gun out of his waistband, and started shooting at a man who was on a pay phone. Defendant then turned, shot down the alley at another person, and returned to the vehicle. Defendant drove to Stateway Gardens, where he changed his clothes and disposed of the gun.

¶ 66    Defendant argues on appeal that when questioned by police, Payton gave eight different versions of the shooting, only one of which, version number seven (the version she gave in her written statement and in her grand jury testimony) identified him as the shooter and made herself an uncharged accomplice to the murder. Defendant contends that version number seven should not have been believed by the jury, given that Payton recanted her written statement and grand jury testimony at trial and testified that the police had coerced her into identifying him.

¶ 67    Defendant also argues that version number seven should not have been believed because it was contradicted by: Jenkins's eyewitness testimony indicating that the shooter was shorter and thinner than defendant and that defendant was not the person who shot him; Robinson's testimony that the shooter was the passenger, not the driver, of the SUV; and the fingerprint evidence showing that defendant's fingerprints were not found on the steering wheel or door of the SUV that he allegedly drove on the night of the shooting but were only found on a beer bottle taken from Payton's apartment the day after the shooting and on a CD case that was recovered from the vehicle. Defendant argues that the fingerprint evidence shows only that he was at Payton's apartment the day after the shooting, not that he was in the SUV on the night of the shooting.

Defendant also argues that the evidence of his fingerprint on the CD case was irrelevant because there was no evidence when the CD case was put in the SUV or that he left his fingerprint on the CD case while it was in the vehicle.

¶ 68    Defendant asks us to follow the dissenting justice's conclusion on direct appeal in *People v. Logan*, 352 Ill. App. 3d 73, 84 (2004) (Tully, J., dissenting) that "this evidence [is] so unsatisfactory as to justify reasonable doubt of defendant's guilt."

¶ 69    Defendant is essentially attempting to relitigate whether the State proved him guilty beyond a reasonable doubt. However, defendant's argument regarding the alleged insufficiency of the evidence has been rejected no less than three times: on direct appeal by the majority opinion in *Logan*; by the postconviction court during second-stage proceedings on his initial postconviction claim; and by the federal court during proceedings on his *habeas* claim.

¶ 70    Defendant now attempts to reargue the sufficiency of the evidence for a fourth time here in the appeal from the denial of the actual innocence claim in his successive petition. However, in a successive postconviction proceeding, all issues actually decided on direct appeal or in the original postconviction petition or during proceedings on a federal *habeas* petition are barred under the doctrine of *res judicata*. *People v. Anderson*, 375 Ill. App. 3d 990, 1000 (2007); *People v. Terry*, 2012 IL App (4th) 100205, ¶ 29. Defendant's claim here that he was not proved guilty beyond a reasonable doubt is barred by *res judicata* as it was previously addressed and rejected on direct appeal and during the initial postconviction proceedings and during the *habeas* proceedings, and he may not relitigate that issue during successive postconviction proceedings under the guise of an actual innocence claim. Instead, our review of the third-stage denial of defendant's actual innocence claim is limited to a determination as to whether the postconviction court was manifestly

erroneous in finding that Walls's new testimony was so incredible that a jury probably would not reach a different result after considering it alongside the prior evidence.

¶ 71      In finding Walls's testimony to be incredible, the postconviction court focused on a number of factors that we discussed earlier in this order, including: that he was subject to impeachment by his prior convictions; he gave inconsistent testimony regarding whether he knew Mosby's real name; he remembered the date of the shooting at issue here but did not remember the date of his own offenses; he gave an improbable account that the shooting occurred on a date when the GDs decided to hold a planning session for a picnic in a rival gang's territory; he could not recall details (such as Baby Girl's name and the owner of the automobile he was driving) that would corroborate his account of the shooting; and he gave inconsistent testimony as to whether Mosby saw him on the night of the shooting.

¶ 72      Such a credibility determination was uniquely appropriate for the postconviction court to make during the third-stage evidentiary hearing, given that it saw and heard Walls's testimony first-hand, and we will not substitute our judgment therefor. *Coleman*, 2013 IL 113307, ¶ 97. We find no manifest error in the postconviction court's finding that Walls's testimony was incredible and probably would not lead to an acquittal on retrial.

¶ 73      Defendant argues, though, that in rejecting Walls's testimony, the postconviction court improperly relied on several pieces of information outside the record. A determination made by the court based on matters outside the record untested by cross-examination constitutes a denial of due process. *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962).

¶ 74      First, defendant contends that the court improperly relied on its assumption outside the record that he offered Walls a financial incentive to implicate Mosby in return for which defendant would file a civil suit for wrongful arrest and share any judgment with Walls. Our review of the

record shows that while the court stated that the possibility of such financial gain was a "possible motive" for Walls's testimony, and that there was a "trend" of inmates giving false testimony to secure another inmate's freedom and share in the resulting judgment from a civil suit, each case must be decided "on its own." The court further stated that while "everyone needs to at least be aware of" this trend, it would not "judge Mr. Walls's testimony on anybody else's or any other situations like this." The court then proceeded to give its reasons for finding Walls incredible and disbelieving his testimony, including his "flip-flopping on important issues," his "demeanor on the witness stand," and his impeachment with his prior convictions. The trend of inmates giving false testimony for future monetary gain was not one of the reasons listed by the court as influencing its credibility determination. Accordingly, on this record, we find no due process violation.

¶ 75 Defendant argues that we should reverse the denial of the actual innocence claim in his successive petition because when discussing the trend of inmates giving false testimony in exchange for the possibility of future monetary gain, the court improperly made a sarcastic remark that the police should just question inmates to solve all crimes. Defendant likens this case to *People v. Jones*, 2016 IL App (1st) 141008. In *Jones*, we reversed and remanded for a new trial based on certain improper comments made by the prosecution during opening statements. *Id.* ¶ 30. We then examined the trial court's comments during sentencing, noting that they displayed a "categorical bias" against all defendants who apologize to their children after committing crimes. *Id.* ¶ 37. We held that judges are required to be fair and dispassionate arbitrators above all else, and that the court's sarcastic comments expressing a categorical disbelief of any defendant who apologizes to his children after committing crimes reflected neither dignity nor courtesy as required by the Illinois Code of Judicial Conduct. *Id.* ¶ 38. Accordingly, we ordered that the trial on remand should take place before a different judge. *Id.*

¶ 76   In the instant case, the postconviction court's comment regarding how the police should just question inmates to solve all crimes, while sarcastic, did not express a categorical disbelief of a class of defendants or inmates; rather, the court elsewhere indicated that each case turns on its own facts and that when an inmate gives testimony during postconviction proceedings exonerating a defendant, such testimony must be individually examined to determine its credibility. On this record, unlike *Jones*, defendant has not shown that the postconviction court was unfair, biased, or so discourteous to him as to run afoul of the Illinois Code of Judicial Conduct or to necessitate reversal of the order denying the actual innocence claim in his successive petition.

¶ 77   Next, defendant contends that when disbelieving Walls's testimony that he remembered the date of the shooting because it coincided with the planning session for a GD picnic at the Willie Mays lounge, the court considered information outside the record in finding that the lounge was in territory controlled by a rival gang, the Blackstones. The court found Walls's testimony that the GDs would hold such a planning session in Blackstones territory to be implausible. Contrary to defendant's argument, the court's finding regarding the location of the GD's alleged planning session in territory controlled by the Blackstones was not based on any information outside the record. Rather, the court's finding was based on Walls's affidavit that was admitted into evidence and that identified the part of town encompassing the Willie Mays lounge as being "controlled by the Blackstones and *** nicknamed 'Terror Town.'" As the court's finding was based on evidence in the record, it did not constitute a due process violation.

¶ 78   Next, defendant contends that in disbelieving Walls's testimony that he drove from his home on the north side of Chicago to the gas station on the southeast side of the city at 75th Street and Yates Boulevard, the court relied on its knowledge outside the record regarding traffic conditions and the length of time it would have taken Walls to drive from his home to the gas

station. The court stated: "although he lives at *** 5200 North, but yet he's way down on that southeast side of the city, miles away, through an unbelievably congested area, from start to finish. It might as well be a hundred miles away to get from 5200 North to get to 70-something-hundred South on the East Side."

¶ 79    The court's assessment regarding traffic conditions and the length of time it would have taken Walls to drive from his home to the gas station was not based on any evidence in the record; however, it was only one component of the court's evaluation of Walls's testimony. Review of the record shows that in finding Walls to be an incredible witness, the court primarily focused on a number of other factors including: his impeachment with his prior convictions; the implausibility of his statement that the GDs would have held a picnic planning session in Blackstones territory; his inability to identify Baby Girl and the owner of the automobile he was driving on the night of the shooting; and his inconsistent testimony regarding whether he knew Mosby's actual name and whether Mosby saw him on the night of the shooting. Given all of the factors that went into the court's evaluation of Walls's testimony, we find no reversible error in its brief allusion to traffic conditions and the time involved in driving from the north side to the southeast side of the city. See *e.g.*, *People v. Thomas*, 377 Ill. App. 3d 950 (2007) (finding no reversible error where the court made a brief allusion to a matter outside the record when disbelieving certain alibi testimony, as the court's credibility determination was not premised solely on that allusion but was focused on many other factors).

¶ 80    Next, defendant argues that the postconviction court misremembered the evidence and manifestly erred in denying the actual innocence claim in his successive petition when it remarked that police officers found a CD-ROM disk inside the shooter's vehicle, as well as defendant's fingerprint.

¶ 81   We find no manifest error, as the court's finding was supported by the evidence at trial showing that officers recovered two CDs and three CD cases from the SUV linked to the shooting and that one of the CD cases had a fingerprint on it belonging to defendant. As the CD case with defendant's fingerprint on it was inside the SUV, the court did not err in finding that defendant's fingerprint was found "inside the vehicle."

¶ 82   Next, defendant argues that the postconviction court manifestly erred by applying the wrong legal standard in denying the actual innocence claim in his successive petition. Defendant cites *Robinson*'s holding that when considering a postconviction claim of actual innocence, the court is tasked with determining whether it is probable that "the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48. Our review of the record shows that the postconviction court correctly applied the *Robinson* standard as it expressly noted that it was tasked with determining whether Walls's new testimony would create the probability of a different result on retrial. Accordingly, defendant's argument that the court applied the wrong legal standard is without merit.

¶ 83   Defendant takes issue with the postconviction court's credibility findings, arguing that while the court found Walls to be incredible, a jury could come to the opposite conclusion and therefore we should reverse the denial of the actual innocence claim in his successive petition and remand for a new trial. We disagree. The court denied defendant's actual innocence claim after a third-stage evidentiary hearing. At this stage, the court acts as a fact-finder, making credibility determinations and weighing the evidence (*Reed*, 2020 IL 124940, ¶ 51) before deciding whether it is probable that the new evidence in conjunction with the previous evidence at trial would lead to a new result. *Robinson*, 2020 IL 123849, ¶ 48. As we have discussed, the postconviction court here correctly applied the *Robinson* standard, found Walls to be incredible based on a number of

reasons that it cited for the record, and determined that his new testimony probably would not change the result on retrial. We find no manifest error.

¶ 84    Next, defendant argues that the postconviction court erred when it denied him leave to supplement his successive petition with a claim of actual innocence predicated on the 911 recording turned over to counsel during the evidentiary hearing. Our review is *de novo*. *People v. Hauad*, 2016 IL App (1st) 150583, ¶ 50.

¶ 85    We find no error. Our supreme court has held that a defendant can only raise a "free-standing" claim of actual innocence in postconviction proceedings. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). A "free-standing claim of innocence means that the newly discovered evidence being relied upon is not being used to supplement an assertion of a constitutional violation with respect to [the] trial." (Internal quotation marks omitted.) *People v. Orange*, 195 Ill. 2d 437. 459 (2001) (quoting *Hobley*, 182 Ill. 2d at 443-44).  Here, defendant was offering the 911 recording not only to support his claim of actual innocence but also to support a claim of ineffective assistance of trial counsel[3]. Therefore, defendant's actual innocence claim was not "free-standing" and may not be asserted in the successive petition. See *Hobley*, 182 Ill. 2d at 443-44 (defendant's newly discovered fingerprint evidence, as well as evidence that officers at Area 2 engaged in a pattern and practice of police torture, failed to support a free-standing claim of actual innocence as such evidence also was being used to supplement his assertions of other constitutional violations).

---

[3] Defendant made no argument in his appellant's brief regarding his ineffectiveness claim and did not raise the issue during the oral argument held on this case and thus has forfeited review thereof. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 86 Defendant argues that we recently reached a different result in *People v. Martinez*, 2021 IL App (1st) 190490. In *Martinez*, a division of this court noted that *Hobley* identified no principle or purpose that is furthered by the rule prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. *Id.* ¶ 102. *Martinez* recognized that "[a]rguably, the *Hobley* rule *may* serve a purpose where a defendant seeking leave to file a successive postconviction petition asserts actual innocence to circumvent the cause-and-prejudice test that applies when determining whether a defendant is entitled to leave to file a successive petition." (Emphasis in original.) *Id.* ¶ 103. However, the case before the *Martinez* court involved the second-stage dismissal of a successive petition, not the leave-to-file stage, and therefore the court found there was no purpose in prohibiting defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. *Id.*

¶ 87 The *Martinez* court also held that the *Hobley* rule was inconsistent with the Illinois Supreme Court's more recent pronouncements on actual innocence in *Coleman*, 2013 IL 113307. In *Coleman*, the Illinois Supreme Court stated that "a freestanding actual-innocence claim is independent of any *claims* of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence." (Emphasis added.) *Id.* ¶ 83. The *Martinez* court construed *Coleman* as contemplating that "the claims be independent, not that the actual innocence claim be independent of the evidence underlying his other constitutional claim or trial error." *Martinez*, 2021 IL App (1st) 190490, ¶ 104.

¶ 88 The *Martinez* court further noted the supreme court's statement in *Coleman* that "[p]rocedurally, a trial court should treat such [an absolute innocence] claim like any other postconviction claim," meaning that the court should only grant relief if defendant has presented supporting evidence that is new, material, noncumulative, and of such conclusive character that it

probably would change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 84. The *Martinez* court determined that *Hobley* effectively imposed an additional requirement: that the evidence underlying the actual innocence claim cannot be used to support any other constitutional claim. *Martinez*, 2021 IL App (1st) 190490, ¶ 105. *Martinez* held that *Hobley*'s additional requirement for raising an actual innocence claim "cannot be reconciled" with *Coleman*. *Id.* ¶ 106.

¶ 89    Subsequent to *Martinez*, though, our supreme court again has had occasion to address when the bar against successive petitions may be lifted and has reaffirmed that one such instance is when petitioner makes a "free-standing" claim of actual innocence, defined as "one in which newly discovered evidence is *not* being used to supplement an assertion of a constitutional violation with respect to the defendant's trial." (Emphasis added.) *People v. Taliani*, 2021 IL 125891, ¶ 56. *Taliani* thus effectively reaffirmed *Hobley* and rejected *Martinez*'s finding that the supreme court's recent jurisprudence contemplates that the actual innocence claim need not be independent of the evidence underlying other constitutional claims. Until the supreme court holds otherwise, *Hobley* remains good law that we are bound to follow. See *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 26 (the appellate court is required to follow supreme court precedent on an issue until the conclusion is revisited by our supreme court or it is overruled by the United States Supreme Court).

¶ 90    Further, the postconviction court's denial of defendant's motion to supplement his successive petition with the 911 recording may be affirmed on a separate basis: that trial counsel was in possession of the recording during trial. To state a claim of actual innocence sufficient to relax the bar on successive postconviction petitions, defendant must present new evidence discovered *after trial* that is material, noncumulative, and probably will change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. As the 911 recording was not discovered after trial, but was available to trial counsel during trial, it was not new and therefore defendant failed to state a claim

of actual innocence premised on that recording. Accordingly, the court committed no error in denying him leave to supplement his petition.

¶ 91    Defendant argues that the 911 recording should be treated as new because it was misplaced or lost post-trial and did not resurface until about 20 years later during the successive postconviction proceedings, when the State discovered the recording and tendered it to postconviction counsel. We disagree. As discussed, evidence is considered newly discovered for purposes of an actual innocence claim only when it is first discovered after trial and could not have been discovered earlier through due diligence. *Id.* The recording here was discovered and made available to defense counsel prior to trial and therefore is not considered new for purposes of defendant's actual innocence claim, regardless of its subsequent post-trial disappearance and resurfacing.

¶ 92    Next, defendant argues that, even if the 911 recording was not newly discovered and therefore was insufficient in and of itself to support a claim of actual innocence, such evidence still should have been considered when evaluating the conclusiveness of the claim of actual innocence predicated on Walls's new testimony. Defendant is essentially seeking to find a way to have the 911 recording considered in support of his postconviction claim of actual innocence, even though our supreme court has held that postconviction claims of actual innocence may only be predicated on newly discovered evidence and the 911 recording at issue here was not newly discovered. In an attempt to circumvent the newly discovered evidence requirement, defendant argues that since Walls's testimony is new, the court was required to consider that testimony during the third-stage evidentiary hearing alongside *all* evidence new and old, including the 911 recording, to determine whether confidence in the verdict is undermined.

¶ 93    Defendant's argument is unavailing. Our supreme court has held:

"In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places *the evidence presented at trial* in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 97.

¶ 94 *Coleman* teaches that during the third-stage evidentiary hearing, the court only may consider the newly discovered evidence alongside "the evidence presented at trial" when determining whether the new evidence is so conclusive that the court's confidence in the judgment of guilt is undercut. In the present case, Walls's testimony was newly discovered and therefore the court considered it along with the evidence presented at trial. However, as the 911 recording was not newly discovered and never was presented at trial, the court properly declined to consider it when evaluating the conclusiveness of Walls's testimony.

¶ 95 For the same reason, we reject defendant's argument that the court also should have considered his alibi witnesses when evaluating the conclusiveness of Walls's testimony during the third-stage hearing. The alibi witnesses were not newly discovered, as they were known to trial counsel prior to trial, and they were not called to testify because trial counsel determined that the jury would not find them credible. As the alibi witnesses were not newly discovered and never testified at trial, the postconviction court could not consider them when evaluating the conclusiveness of Walls's testimony.

¶ 96 Finally, defendant argues that the postconviction court erred during the second stage of proceedings when it dismissed his claim of actual innocence predicated on Evans's pattern of excessive force. Our review is *de novo*. *Minniefield*, 2014 IL App (1st) 130535, ¶ 58.

¶ 97   The court committed no error here. Our supreme court has recognized the viability of a "free-standing" claim of actual innocence in postconviction review, meaning that the newly discovered evidence also is not being used to supplement an assertion of a constitutional violation at trial. *Hobley*, 182 Ill. 2d at 443-44. As we have discussed, *Hobley* remains good law that we are bound to follow. Here, defendant's claim of actual innocence predicated on Evans's pattern of excessive force was not free-standing because the evidence against Evans also was used to support defendant's *Brady* claim.[4] Accordingly, the postconviction court did not err in dismissing defendant's actual innocence claim predicated on Evans's pattern of excessive force. See also *Orange*, 195 Ill. 2d at 459-60 (affirming the dismissal of the defendant's postconviction claim of actual innocence based on newly discovered evidence of police brutality, finding that the actual innocence claim was not free-standing because the evidence of police brutality also was being used to supplement his claim that his confession was coerced); *People v. Gonzalez*, 2016 IL App (1st) 141660 (affirming the second-stage dismissal of the defendant's actual innocence claim because the newly discovered evidence of a detective's pattern and practice of framing suspects also was being used to supplement his alleged *Brady* violation and thus the actual innocence claim was not free-standing).

¶ 98   Even if defendant's evidence of Evans's pattern of excessive force was not being used also to support his *Brady* claim, we still would affirm the court's second-stage dismissal. Essentially, defendant's argument on appeal is that Evans had a vendetta against him based on the federal civil rights lawsuit and complaint with the OPS he filed against Evans arising out of the shooting that occurred in November 1996. Based on that vendetta, Evans coerced Payton into implicating him

---

[4] Defendant is not arguing on appeal for the reversal of the second-stage dismissal of his *Brady* claim and has forfeited review thereof. See Illinois Supreme Court Rule 341(h)(7).

in the murder. Defendant contends that he made a substantial showing of his actual innocence sufficient to survive second-stage dismissal because the evidence of Evans's pattern of excessive force showed his capability of engaging in such an effort to frame him.

¶ 99    We find that Evans's pattern of excessive force in unrelated cases failed to make a substantial showing of defendant's actual innocence that probably would lead to a different result on retrial, as there is no evidence that Evans used excessive force during defendant's arrest or that he was involved in Payton's interrogation or coerced her in any way. Given the dissimilarity between Evans's pattern of excessive force and his conduct in this case, the postconviction court committed no error in dismissing defendant's claim of actual innocence predicated on Evans's history of misconduct. See *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 190 (to make a substantial showing of actual innocence based on a pattern of police misconduct, defendant must show that the prior acts of misconduct were similar to the acts committed by the officer against him here).

¶ 100   For all the foregoing reasons, we affirm the judgment of the circuit court.

¶ 101   Affirmed.